UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

JOHN DOE,                                      Civil Trial No: 16 cv 03531

Plaintiff,                                     AMENDED COMPLAINT

-against                                       Jury Trial Demanded

CORNELL UNIVERSITY,
WEILL CORNELL MEDICAL CENTER

Defendants.
--------------------------------------------------------x

Plaintiff, JOHN DOE, by his attorneys, THE KAPLAN LAW OFFICE, as and for his

Amended Complaint against CORNELL UNIVERSITY and WEILL CORNELL MEDICAL

CENTER respectfully alleges as follows:

### SUMMARY OF THE CASE

1.     This case arises out of an intentionally discriminatory and wrongful disciplinary action

that falsely alleged, among other things, that plaintiff, one of only a few African-American

medical students at defendant, Weill Cornell Medical Center ("WCMC") committed sexual

battery and sexual misconduct against a former girlfriend, Jane Doe, in connection with a hug in

her dorm room that led to her having a broken toe when John's foot jammed into her toe.

2.     Whether the hug was enacted just after John allegedly asked Jane for sex, which she

allegedly declined; or whether John even asked Jane for sex; or whether the hug was forced; or

whether Jane reluctantly participated in the hug as opposed to verbally and physically resisted

the hug; or whether the hug was John's first move in a scheme to allegedly pull Jane towards her

bed or throw Jane on the bed to engage in sexual activity depends on which version, or which

amalgamated version of Jane's multiple, inconsistent, and increasingly embellished accounts defendants chose to credit.

3.      The only constant in Jane's stories is that once her toe broke, whatever else Jane and John were doing came to a halt.

4.      However, once Jane's toe was injured during the hug, or when John pulled her towards the bed, or when she was thrown on the bed or when she and John were struggling while standing on the bed; or when she tried to flee the bed to obtain pepper spray (a detail that Jane first mentioned months after the event and after numerous interviews with not only defendants' investigative team but New York City detectives) also depends on which version, or which amalgamated version of Jane's multiple, inconsistent, and increasingly embellished accounts defendants chose to credit.

5.      All such claims, but for the hug, during which John jammed Jane's toe, were consistently denied by John.

6.      Nevertheless, it was John's credibility, not Jane's, that defendants doubted and challenged.

7.      Defendants suspended John weeks before graduating as a medical doctor and entering into a coveted neuro-surgery residency bringing him to the brink of emotional, professional and financial ruin.

8.      The disciplinary action was commenced by Jane, a female medical student of Asian descent, at WCMC on or about September 22, 2015 concerning events that occurred on September 17, 2015 (the "Disciplinary Action").

9.      Prior to Jane's Disciplinary Action, WCMC had never before managed a disciplinary

action addressing sexual misconduct, and John was WCMC's first male and Nigeria-

born/African-American respondent in a disciplinary action alleging sexual misconduct.

10.     On or about February 11, 2014, a WCMC faculty member and supervisor of a WCMC

laboratory in which John was employed sent a series of emails to another lab worker in which he

compared John to a Neanderthal and characterized him as an "early human form sub-Sahara

Africa, one of those who never left, thrown 45,000 years into the future."

11.     John's supervisor went onto to state that John "is going to have a very hard live *[sic]*.

People will think he is crazy and will treat him like shit. And he will think everyone is racist. He

is right though, people cannot stand him precisely because he is black . . ."

12.     John left his employment in the lab in 2014 to return to his coursework and by September

2015, he was entering his fourth and last year of medical school and applied for entrance into

residency programs in neuro-surgery. John matched with a neuro-surgery residency program on

or about March 14, 2016 which he accepted (the "Residency Program").

13.     WCMC's management of Jane's accusations is governed by rules and regulations set

forth in WCMC's, Procedures Sexual Misconduct Defendant (the "WCMC Procedures").

14.     Cornell's, Policy 6.4 (Policy 6.4) also applied to WCMC's Procedures and Jane's

complaint was adjudicated under Cornell's Policy 6.4 (the WCMC Procedures and Cornell's

Policy 6.4 are collectively, the "Defendants' Policies").

15.     Among other things, the Defendants' Policies promise "impartial" and "thorough"

investigations and in particular are committed "to maintain a university environment that is safe

and free from prohibited discrimination" and claims specifically that Cornell "has adopted

policies in support of this goal and complies with all applicable federal, state, and local laws."

16.     Further, Defendants' Policies prohibit retaliatory acts against any party to such disciplinary action.

17.     However, in direct violation of such federal and state laws as well as its own Policies, defendants' treatment of John was discriminatory and motivated by sexual and/or racial bias. As such, defendants exercised stereotypes that favored Jane and discriminated against John.

18.     As a result, the investigation was slanted in favor of Jane, and the JA recommended that John be suspended.

19.     WCMC's Appeal Panel did suspend John, a penalty WCMC's Review Panel previously rejected as being "unduly punitive."

20.     Cornell's lead investigator, Elizabeth McGrath and assistant investigator, Susan Affel, are white woman (collectively, the "JA") and the members of WCMC's Appeals Panel were all white.

21.     The only participant in the Disciplinary Action who was not white, but African American, was a member of the Review Panel, which, in contrast to the JA and the Appeal Panel, did not pursue suspension.

22.     Defendants' bias towards Jane is best illustrated in the following synopsis of events:

23.     Jane and John lived in the same dormitory and were sexual partners from approximately May 2015 to June 2015. During such time, Jane moved into John's dorm room.  After their intimate relationship ended, they continued to communicate, sometimes lasciviously, with each party asserting sexually titillating propositions to the other.

24.     With regard to the September 17, 2015 event, Jane went to New York Presbyterian Hospital's emergency room hours after the event and told the attending health-care personnel that her toe broke as a result of an accident that occurred while John pulled her towards him.

25.     In Jane's first account to WCMC's Title IX Coordinator, Dr. Murray, on September 18, 2015, she stated that she "reluctantly agreed to one hug" and that John "tried to forcefully pull her over toward him . . . and in doing so, she lost her balance and fell forward, where her toe crammed into his foot."

26.     In Dr. Murray's account of the statement John made on September 18, 2015, he reported that John "claims that he tried to give her a hug and he stepped on her toe."  Dr. Murray also reported that John further denied trying to force her to do anything, and claimed "he stepped on her toe by accident."

27.     In Jane's Complaint of a Policy 6.4 Violation dated September 22, 2015, the reluctant hug, lost balance, and crammed toe turned into an act in which John "pulled [Jane] out of her chair against her will and threw her towards the bed against her will. [John's] alleged conduct involved [. . . ing *(illegible)* Jane's] toe with his own foot."

28.     By September 25, 2015, during Jane's first interview with the JA, Jane changed her story from being thrown "towards" the bed and alleged that John "threw her on the bed" and his "bare foot" broke her toe while they were standing on the mattress with each party struggling to either initiate or resist sexual activity.  Such activity caused Jane to fall to the "ground*"* in pain, rather than the mattress on which they were allegedly standing.

29.     Within nearly four months of the JA's investigation, Jane represented upwards to fifteen (15) different versions of the September 17, 2015 event.

30.     These inconsistencies are material and relevant to Jane's complaint and the alleged violations.  For example, whereas during an interview on September 25, 2015, Jane represented that she "physically and verbally" resisted the hug, on September 30, 2015, she characterized her response to the hug as passive and that she was "standing like a flopping fish as he hugged her,"

5

much like her initial representation to Dr. Murray on September 18, 2016 in which she stated that she "reluctantly agreed" to the hug.

31.      By the time Cornell's Investigative Report was issued on January 14, 2016 (the "Investigative Report"), the JA characterized the September 17, 2016 events as a sexual "attack" in which John, having just asked her for sex, which Jane declined, "grabbed her by the arms while she was seated, and lifted her and forced her body against his body *[a/k/a/ a hug],"* over her voiced objections and without her consent. During the attack, [Jane] told [John] to let her go and struggled to get away from him. As they struggled, his foot collided with her foot, breaking her toe."

32.      John was found responsible for sexual battery and sexual misconduct.

33.      Jane sought John's expulsion from WCMC.

34.      However, Cornell recommended to WCMC's Review Panel, a three-member committee made up of WCMC faculty and administrators, that John be suspended for one-year upon completion of his course work, thus delaying his graduation for one year.

35.      The Review Panel rejected the recommendation of suspension as being "unduly punitive."

36.      The Review Panel's report is dated March 14, 2016.  On information and belief, John's match with his neuro-surgery residency was confirmed that day.

37.      Jane appealed the Review Panel's failure to impose the suspension arguing that without the suspension, residency programs may match with him "without knowing of his violations."

38.      Jane, who had previously threatened that she would sue WCMC if her complaint was not handled as she wished, also claimed in her appeal that she would be disappointed if defendants' did not suspend John.

39.     The Investigative Report includes statements from Jane in which she asserts that she had

been talking with lawyers about her allegations and that she would litigate against defendants.

She also asserted numerous that John's goals are focused on matching with a residency program

and how important his medical career was to him.  Jane also believed that John's family was

wealthy, and that he didn't have to be a doctor.

40.     However, John has accumulated nearly $400,000.00 in loans for his medical school

tuition, and as Jane herself acknowledged, the entire focus of John's adult life had been to be a

neuro-surgeon.

41.     Under suspension, John would lose his match with the neuro-surgery residency program

and be ineligible for any employment requiring a medical degree for another year.  But even

after obtaining his degree, on information and belief, the likelihood of matching with any

residency program, let alone an elite and competitive residency in neuro-surgery, would be

foreclosed.

42.     On April 28, 2016, WCMC's Appeals Committee, fully aware of John's match with his

Residency Program, intentionally granted Jane's appeal and imposed the extreme and outrageous

punishment of a one-year suspension.

43.     In the immediate aftermath of the Appeal Decision, John, who had already lost 80 pounds

due to the emotional distress of the investigation, suffered an extreme emotional response in

front of Dr. Murray.

44.     Dr. Murray called in Dr. Friedman to evaluate John, who asked John he was suicidal and

if he wanted to be hospitalized.

45.     John did not want to be hospitalized and went to the Brooklyn Bridge feeling totally hopeless believing that his life had come to an end. However, he was coached by a close advisor via cell phone to exit the bridge and go to a nearby church instead.

46.     John entered into counseling with WCMC's Dr. Michael Sacks.  Dr. Sacks prescribed medications for John in connection with his emotional distress and anxiety. Prior to Dr. Sacks, defendants offered him no counseling for his emotional distress.

47.     John petitioned this Court under seal to temporarily enjoin the suspension.

48.     A sealed (closed-door) hearing was held on May 20, 2016 in which the Court granted John's petition allowing him to graduate.

49.     At all times relevant to the allegations herein, Jane and John were prohibited by a no-contact order to not contact each other through any electronic means.

50.     Jane was identified in plaintiff's pleading as a defendant, but she was not served, and she did not appear and was not represented in the Courtroom during the hearing.

51.     On information and belief, Jane was informed of the hearing and its outcome by defendant WCMC.

52.     On information and belief, WCMC also informed Jane of the identity of John's Residency Program, information John asked WCMC to not disclose publicly so that Jane would not have the information.

53.     On the evening of May 20, 2016, John received a phone call from an anonymous female who asked him about the injunction and whether he will gain a valuable settlement.

54.     On or about May 25, 2016, Jane notified John's Residency Program via email of John's alleged physical and sexual misconduct. On information and belief, Jane erroneously stated in the email that John was on "probation."

55.     Whereas Jane, during the course of the investigation, caused the arrest of John, he was never tried or convicted, there was no determination of guilt, and he was not sentenced to probation.  Instead, he was given an ACD, which is not a determination of guilt and is ultimately a nullity.

56.     On or about May 26, 2016 John again received a phone call from an anonymous female asking if he was still going to attend his Residency Program.

57.     John complained to WCMC of the phone calls and the defamatory email to the Residency Program, and requested that WCMC investigate Jane for violation of the no-contact order, harassment and retaliation.

58.     On information and belief, WCMC asked Jane about the phone calls, which she denied making, and WCMC stopped pursuing the investigation.

59.     On information and belief, WCMC did not pursue John's retaliation claim.

60.     On information and belief, WCMC, without any investigation whatsoever, concluded that Jane's email to the residency program was protected speech.

61.     Jane's email to the Residency Program caused John's position in the residency program to be in jeopardy and on June 13, 2016, the residency program terminated its House Staff Appointment Agreement with John.

62.     On or about June 15, 2016, the Residency Program entered into a probationary House Staff Appointment Agreement with John citing, among other things, any act of sexual misconduct or domestic violence as well as any lapse of thorough honesty or forthright manner in his duties as a basis to terminate John's residency.

63.     Throughout the Disciplinary Action, Jane held the status of the complainant or accuser and John held the status of the respondent or the accused in the Disciplinary Action.

64.     Each status or capacity permitted limited (and temporary) prescribed presumptions specific to each party with regard to the accused's innocence until proven otherwise or the credibility of the accuser's initial complaint.

65.     Such status, however, in an impartial investigation, does not allow greater weight to the accuser's statements and evidence in comparison to the accused's statements and evidence.

66.     Also, the credibility and motives of each party in an impartial investigation must be weighed by the same standards and criteria.

67.     Further, each party to an impartial investigation, regardless of status, must have the same rights with regard to presenting witnesses and evidence and the weight of such witnesses and evidence must be determined by the same standards and criteria.

68.     As will be discussed below, John's statements, witnesses, evidence in his favor were given lesser weight than those of Jane and in some instances disregarded entirely.

69.     At the same time, Jane's statements were valued disproportionally to their inconsistencies. Indeed, the JA not only included the contradictory statements into its investigative report without questioning the inconsistencies, the JA—not Jane—actually unilaterally offered excuses and explanations for the inconsistent elements of the incident.

70.     Such differences in the way defendants treated Jane as opposed to John is attributable to the differences in either each's gender and/or race, with defendants' biases favoring the Asian, female, Jane, over the African-American, male, John.

71.     Plaintiff brings this action against defendants' Cornell and WCMC for gender discrimination in violation of Title IX, racial discrimination in violation of Title VI as well as federal and state violations and breaches of defendants' own policies and procedures.

## THE PARTIES

72.     John, is a natural person, citizen of the United States, and resident of the State of New York.

73.     During the events described herein, John was a student at Weill Cornell and resided in New York City.

74.     Defendant Cornell University is a private, university in the city of Ithaca, New York.

75.     Defendant Weill Cornell Medical Center is Cornell's medical school located in New York, NY.

## JURISDICTION AND VENUE

76.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and under 28 U.S.C. § 1367 because the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

77.     This Court has personal jurisdiction over Defendants Cornell and Weill Cornell on the grounds that each is conducting business within the State of New York.

78.     Venue for this action properly lies in this district pursuant to 28 U S C §1391 because Cornell is considered to reside in this judicial district by virtue of its medical college, Weill Cornell, and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

### Governing Statutes and Policies

79.     The Disciplinary Action was subject to rules and regulations set forth in WCMC's, Procedures Sexual Misconduct and Cornell's Policy 6.4 (Policy 6.4), the Defendants' Policies.

80.     Defendants and their respective policies and procedures are also subject to Article 129-B of NY CLS Educ Law.

81.     Cornell's Policy 6.4, which is applicable to cases involving allegations of sexual discrimination, sexual harassment, and sexual assault, states in relevant part that the university has a "commitment to maintain a university environment that is safe and free from prohibited discrimination," and in support of this commitment, the university has "adopted policies in compliance with all applicable federal, state, and local laws" to insure that acts of discrimination, do not "undermine the university's commitment by threatening careers, educational experience, and well-being of those associated with the university."

82.     Policy 6.4 requires that its JA is responsible for receiving all complaints and providing procedures to ensure a fair process for the accused and for the complainant. The JA has exclusive responsibility for accepting and processing prohibited discrimination and protected-status harassment complaints, including sexual assault/violence, and will undertake to resolve these complaints impartially, promptly, and confidentially.

83.     WCMC is responsible for forwarding complaints of harassment and retaliation to the JA.

84.     According to Policy 6.4, if the JA determines that the complaint describes an alleged violation of its policy, an investigation will be commenced. The purpose of such investigation being "to gather evidence relating to the alleged discrimination, harassment, sexual assault/violence or retaliation to determine whether the accused engaged in conduct constituting discrimination, harassment, or retaliation by a preponderance of the evidence."

85.     Cornell's Policy 6.4 expressly covenants to provide, in relevant part, the following rights to the accused student in a sexual misconduct investigation: To have the investigation completed

within 60 days; to seek the advice of a personal attorney or advisor, who may attend their own clients' or advisees' investigative interview; and to be kept informed of the investigation's status.

86.     NY CLS Educ Law, Title VII, Art. 129-B, §6443 provides all students the right to . . . "[p]articipate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard . . . [b]e treated with dignity and to receive from the institution courteous, fair, and respectful . . . counseling services, where available . . . [b]e protected from retaliation by the institution, any student, the accused and/or the respondent, and/or their friends, family and acquaintances within the jurisdiction of the institution . . . and . . .[e]xercise civil rights . . . without interference by the investigative, criminal justice, or judicial or conduct process of the institution."

87.     NY CLS Educ Law, Title VII, Art. 129-B,§6444 also provides students "[t]he right to a process in all student judicial or conduct cases: (i) notice to a respondent describing the date, time, location and factual allegations concerning the violation, a reference to the specific code of conduct provisions alleged to have been violated, and possible sanctions; (ii) an opportunity to offer evidence during an investigation, and to present evidence and testimony at a hearing, where appropriate . . . and (iii) access to at least one level of appeal of a determination before a panel, which may include one or more students, that is fair and impartial and does not include individuals with a conflict of interest . . . a prompt response to any complaint and to have the complaint investigated and adjudicated in an impartial, timely, and thorough manner by individuals who receive annual training in conducting investigations of sexual violence, the effects of trauma, impartiality, the rights of the respondent, including the right to a presumption that the respondent is "not responsible" until a finding of responsibility is made pursuant to the provisions of this article and the institution's policies and procedures, and other issues including,

but not limited to domestic violence, dating violence, stalking or sexual assault . . . an investigation and process that is fair, impartial and provides a meaningful opportunity to be heard, and that is not conducted by individuals with a conflict of interest . . .[t]o review and present available evidence in the case file, or otherwise in the possession or control of the institution, and relevant to the conduct case, consistent with institution policies and procedures. . . .[t]o exclude their own prior sexual history with persons other than the other party in the judicial or conduct process or their own mental health diagnosis and/or treatment from admittance in the institution disciplinary stage that determines responsibility."

88.     Further, NY CLS Educ Law, Title VII, Art. 129-B, § 6444 only permits that *past findings* of domestic violence, dating violence, stalking, or sexual assault *may be admissible in the disciplinary stage that determines sanction [emphasis added].*

89.     NY CLS Educ Law, Title VII, Art. 129-B, § 6444 also provides that "[f]or crimes of violence, including, but not limited to sexual violence, defined as crimes that meet the reporting requirements pursuant to the federal Clery Act . . ., institutions shall make a notation on the transcript of students found responsible after a conduct process that they were 'suspended after a finding of responsibility for a code of conduct violation' or 'expelled after a finding of responsibility for a code of conduct violation.' For the respondent who withdraws from the institution while such conduct charges are pending, and declines to complete the disciplinary process, institutions shall make a notation on the transcript of such students that they 'withdrew with conduct charges pending.' Each institution shall publish a policy on transcript notations and appeals seeking removal of a transcript notation for a suspension, provided that such notation shall not be removed prior to one year after conclusion of the suspension, while notations for

expulsion shall not be removed. If a finding of responsibility is vacated for any reason, any such transcript notation shall be removed."

90.   Neither WCMC nor Cornell have a published policy regarding transcript notations for sanctions pursuant to violations of Policy 6.4 during the relevant time.

91.   WCMC Procedures require that the "formal investigation" must be completed within 60 days' and that WCMC will "strive to resolve all reports and complaints of sexual harassment, sexual assault/violence, domestic/intimate partner violence and stalking within 60 days."

92.   Neither the WCMC Procedures nor Cornell's Policy 6.4 require that all complaints must be prosecuted; instead a complaint may be dismissed and the case closed if, among other things, it is not supported by sufficient facts or otherwise lacks merit.

93.   Cornell's JA, Ms. McGrath and Ms. Affel, interviewed all witnesses in the Disciplinary Action, including the complainant and the respondent.

94.   Ms. McGrath and Ms. Affel compiled and drafted the Investigative Report dated January 14, 2016.

95.   In the Investigative Report, Ms. McGrath and Ms. Affel made conclusions of fact.

96.   In the Investigative Report, Ms. McGrath and Ms. Affel recommended sanctions.

97.   WCMC's Review Panel issued its sanctions on March 14, 2016.

98.   WCMC Procedures require that the "formal investigation" must be completed "within 60 days," unless "good cause" is shown, and that WCMC will "strive to resolve all reports and complaints of sexual harassment, sexual assault/violence, domestic/intimate partner violence and stalking within 60 days."

99.    On information and belief, the JA has a pattern of attributing stereotypical gender-roles to the parties in a disciplinary action in which females are passive actors and the male is sexually aggressive.

100.    On information and belief, the JA has in prior complaints ignored and/or excused facts in connection with a female's sexual practices in which the female is alleged to have initiated sex, practiced unsafe sex, initiated sex with a stranger, or appeared promiscuous.

101.    At the same time, the JA, on information and belief, has a pattern of imposing a sexual stereotype on male students of being the sexually aggressive.

102.     On information and belief, the JA has a pattern of supporting its point of view that females are sexually passive and prudent with excuses, explanations and judgments that slant the JA's narrative in favor of the female party to the investigation.

103.    On information and belief, Cornell began to implement changes to its Policy 6.4 in Fall 2015 to, among other things, include a hearing before the review panel and to disallow the JA to make recommendations of sanctions in the investigative report.  On information and belief, such changes are to be implemented in Fall 2016.

**The JA's Investigation of Jane Doe**

104.    Jane accused John of two allegedly wrongful events:  a) on or about May 16, 2015, she alleged that John bruised her clavicle when he flipped her over his shoulder (the "May Event"); and b) an incident in her apartment that allegedly began at 3:20 in the afternoon and ended at 3:29 on September 17, 2015 that led to her incurring a broken toe (the "September Event").

105.    With regard to the May Event, John accompanied Jane to the emergency room, for treatment.

106.    The May Event was characterized at the relevant time by both parties as horseplay.

16

107.    Jane's intimate relationship with John continued uninterrupted after the May Event.

108.    The JA did not find John responsible for the May Event.

109.    Jane's account of the circumstances surrounding the September Event varied with respect to details, sequence of events and conclusions that are inconsistent and contradictory.

110.    For example, in Jane's complaint dated September 22, 2015, she affirmed that she "declined to have sex with respondent (sic), and respondent pulled the Complainant out of her chair against her will and threw her towards the bed against her will" at which point her toe was injured.

111.    However, in Jane's NYPD Domestic Incident Report (DIR), which she signed under penalty of perjury dated September 23, 2015, she alleged that John "pull me from my chair against my will, hug me and press his body parts on mine and then drag me to the bed against my will. I resisted at each point and said "No Stop." He dragged me to the bed and tried to pull me towards me . . . and I resisted […] His foot came forward and rammed my foot and broke my toe."

112.    On information and belief, Jane was subjected to direct inquiry about the events during her interview with NYPD Detective Vasquez, Special Victim's Unit, conducted in late September.

113.    During that interview, Det. Vasquez reported to the JA that Jane "described that he asked for her a charger and she walked to get it and that he went over her bed to plug it in over bed and that the bed is low to the ground. […] [T]he Complainant said that Respondent tried to engage in horseplay and she stubbed her toe."

114.    However, in an unsworn statement to the JA on September 25, 2015, Jane, alleged that that John "threw her on the bed."

115.    In this version, Jane is on the bed with her back to the wall and in that position, Jane alleged that "she pulled hard as she could to get away from" John during which "his bare foot physically broke her toe."

116.    Later in that same interview, Jane alleged that John "pulled her to be (sic) bed" and John's foot "physically broke her toe . . ."

117.    During the same interview, Jane offered another scenario:  John "lifted her up. He asked for a hug and then literally lifted her off the chair. She did not hug back and was standing like a flopping fish as he hugged her. Afterwards he refused to let her back to the chair. He threw her on to the bed. While on the bed she was physically resisting him. He pulled her towards him while his back is towards the wall. He pulled her to make sexual contact and she said no THREE times. Then he broke her toe as he came forward with his foot. He threw her on the bed so that her back was to the wall. She believed it was an accident to break the foot […].

118.    Jane's, witness and roommate, REDACTED, was in her bedroom down the hall from Jane's bedroom during the encounter.

119.    REDACTED also reported that upon Jane's request she made notes of the event on the day it occurred.

120.    REDACTED responded to Jane's second exclamation of pain after her toe was injured and entered Jane's bedroom.

121.    REDACTED did not hear any other sounds of resistance prior to the outcry of pain.

122.    REDACTED found Jane sitting on the bed and John, in his scrubs, standing by the door.

123.    REDACTED witnessed John walk to the refrigerator and get an ice pack.

124.    REDACTED did not know whether or not John was bare foot or whether he was wearing sneakers, but represented that John walked out of the apartment without stopping to put shoes on.

125.    REDACTED reported "that apparently the guy had come into [Jane's] room and was planning to take a nap. He changed his mind from napping to cuddling or hugging and their feet collided somehow."

126.    Neither REDACTED's notes nor statements include any allegation of sexual assault.

127.    Another of Jane's witnesses, REDACTED, provided a statement based on Jane's representation of the events to him approximately twenty minutes after their occurrence.

128.    On information and belief REDACTED, a medical student, and Jane had or were having at the relevant time a romantic and/or an intimate alliance.

129.    On information and belief, the JA did not investigate the relationship between Jane and REDACTED for the purpose of ascertaining each's motives with regard to probing the incident.

130.    REDACTED reported that Jane represented to him two versions of the events.  The first version stated that after John arrived, "he accidently stepped on her foot."

131.    The first version did not allege sexual assault.

132.    The second version, which Jane revealed to him after his prodding, included the detail of John throwing Jane on the bed:  "Eventually, [Jane] said that [John] came in and wanted to have sex with her. She let him in. […] She said he was on her bed and she was watching a lecture. He propositioned her.  Next, he got up and threw her on the bed. In the process, she (sic) stepped on her toe and it turns out he broke it."

133.    Jane's roommate, REDACTED, reported to the JA that Jane told her later in the evening of September 17, 2015 that John tried to "pull her to the bed and the Complainant

resisted.  She told him to stop and he continued to drag her towards her towards the bed, breaking her toe and causing her to scream in pain."

134.    Jane in her email to John on the evening of Sept. 17, stated that, "I fractured my fourth digit when you pulled me to my bed […]."

135.    Yet, Dr. Joseph Murray, WCMC's Associate Dean of Students and Title IX Coordinator, a trained professional in the handling of Title IX cases for the University, does not report any claim by Jane that John threw or pulled her onto the bed.

136.    Similarly, Jane's characterization of events to the hospital staff during her visit to the emergency room on September 17, 2015, on her medical record from that evening indicate that she represented that her broken toe was an "accident," and there is nothing about being thrown, or a sexual assault.

137.    On or about January 14, 2016, the JA issued to Jane its Investigative Report. On information and belief, by that time Jane had also had a chance to review John's letters to the JA addressing her contradictory statements.

138.    On or about February 4, 2016, Jane testified before WCMC's Review Panel and disclosed new elements of her story including for the first time her effort to get hold of her "pepper spray" while she and John were standing on the bed to help repel John's actions and stated, "I can go for the pepper spray in my bag, which is really far, and I tried, and there's no way . . ."

139.    Jane did not disclose this desperate and calculated attempt to protect herself from sexual assault to REDACTED, REDACTED, REDACTED, hospital personnel, or Dr. Murray even though such alleged sexual assault and such alleged heroic efforts occurred just moments before she reported the events to REDACTED; only minutes before she

reported the events to   REDACTED; just hours before she reported the events to REDACTED and hospital personnel; and only one day before she reported the events to Dr. Murray.

140.    Jane also in her February 4, 2016 testimony introduced a new description of events that blended her allegations of being pulled to the bed with her allegation of being thrown to the bed into a hybrid pulling/thrown event in that John pulled her in such a way that she was thrown on the bed as follows:  "he pulls me in such a way that I actually throw back on the bed.  I don't fall down on the bed, but I'm like thrown back near the wall."

141.    In her Feb. 4 Testimony, Jane also alleges that while on the bed and trying to run for her pepper spray or the door, her toe is broken while she is trying to flee from John: [John] "comes forward, and I'm trying to run for the door, and he steps on my foot. Basically, his foot rams on mine […] it breaks my foot."

142.    The Investigative Report does not account for the JA's thorough investigation of these discrepancies in any of Jane's statements and in particular does not account for the JA's questioning of Jane as to why her accounts are inconsistent.

143.    Instead, the JA makes conclusory statements explaining Jane's inconsistencies that are skewed towards its conclusion of finding John responsible for Jane's allegations of sexual battery and misconduct with respect to the September Event.

144.    In the first instance, the JA accounts for Jane's demeanor during her interviews and reports that she was "agitated," "spoke quickly," "struggled" to keep "composed," and "tried to restrict" the JA's "questions to remain focused on the two violent incidences, "seemed flat."

145.    The JA then contrasts these observations with Det. Vasquez' description of Jane as being "confused" and "unable to articulate why she thought she was about to be sexually assaulted."

146.    However, the JA's report of Det. Vasquez' interview is inaccurate and it does not state that she thought Jane was confused.

147.    The report of Det. Vasquez' interview states that Jane also wanted to read a statement to Det. Vasquez that the Detective did not permit.

148.    The report of Det. Vasquez' interview also stated that when she asked Jane directly why she thought the September Event "was about sex" if John did not have an erection or did not try to take off her clothing, Jane said that the Detective may be right.

149.    The report of Det. Vasquez' interview also disclosed Det. Vasquez' summary of Jane's description of the September Event as follows:  Jane "told [John] she was not interested in sex while he stayed on the bed. She then described that he asked her for a charger and she walked to get it and that he went over her bed to plug it in over her bed and that the bed is low to the ground . . .then . . .[John] tried to engage in horseplay and [Jane] stubbed her toe."

150.    Subsequent to Det. Vasquez' interview with the JA, John uncovered more information from Det. Vasquez about Jane's motives and that Jane had a monetary or vengeful "agenda" and that she was not credible.

151.    John communicated this information to the JA on more than one occasion and on November 4, 2015, John completed a Witness Form requesting that the JA interview Det. Vasquez to specifically ask her about Jane's agenda, credibility and her reasons for closing the case against John.

152.    JA did not re-interview Det. Vasquez.

153.    The JA also did not investigate Det. Vasquez' concerns with regard to John's questions about Jane's agenda and credibility.

154.    Instead, the JA explained that Jane's mental health "deteriorated sharply after the September incident" and that her psychiatrist "confirmed a diagnosis of post-traumatic stress disorder."

155.    The JA's characterization of the psychiatrist's "diagnosis" is also inaccurate.

156.    The alleged PTSD is from a brief doctor's note in which the doctor represents that Jane has "symptoms" of PTSD.  The letter also states that such symptoms are a result of Jane's self-reported account of the September Event.

157.    The doctor's note is not accompanied by any conclusions from or even refers to any diagnostic test that evaluated Jane's mental health.

158.    On information and belief, the JA did not interview the doctor who signed the note.

159.    On information and belief, the JA did not consult a PTSD expert to confirm the note's evaluation.

160.    On information and belief, the JA does not have any confirmation that Jane was ever diagnosed with PTSD during the relevant time.

161.    On information and belief, the JA had no basis to assert that Jane's inconsistencies are in any way related to or a consequence of PTSD.

162.    The JA further explains that Jane's inconsistencies concern "word choice when describing the incident and specific movements in the brief moment leading to the incident and they seem to stem more from confusion and distress than a desire to embellish the story."

163.    The JA does not specify which words Jane used to describe the September Event were wrongly chosen as a result of her confusion and distress.

164.    The JA does not address whether its "word choice" theory also explains the difference between being "pulled to" the bed as opposed to being "thrown on" the bed and the differences between those allegations that pin pointed the toe-breaking as occurring variably:  during the hug; after the hug; during being pulled to the bed; while on the bed; after being thrown onto the bed, or by fleeing the bed.

165.    The JA does not address whether its "word choice" theory also explains why in one version Jane described her participation in the hug as "reluctant;" and in another version as "flopping like a fish," and in other versions as "physically and verbally resisting."

166.    The JA also does not address how its "word choice" theory is not an effort to embellish the story even though the situs and events became more violent in that the incident moved from the floor, to towards the bed, to on the bed, and changed from a hug, to being pulled or dragged to the bed, to being thrown on the bed with intent to instigate sexual acts.

167.    The JA further credits Jane as having "no credible apparent motive to lie about the September incident."

168.    The JA acknowledges that Det. Vasquez did report that Jane may have a monetary motive as she inquired "about restitution for her medical bills and she did tell the investigator that [John] came from a wealthy family," but the JA explains that such representations "seemed due to her fear of retaliation rather than interest in monetary gain."

169.    The JA also found that Jane's allegations regarding the May Event, for which the JA determined was not a violation of Policy 6.4, was not to "strengthen her argument" about the September Event.

170.    Furthermore, the JA found that Jane had "no opportunity to lie," and had "virtually no time to concoct a false story."  Instead, the JA explained that Jane had time "for reflection."

171.    Yet, Jane herself alleged that her initial representations about the September 17, 2016 event were lies made with the motive to protect John's career.

172.    Regardless, Jane soon overcame such self-censure, and more than made up for the alleged deficiencies in her initial representations about the incident and instead of protecting John's career became the chief advocate for destroying it.

173.    The JA, even when faced with Jane's admission of an alleged lie and motive, chose to overlook the alleged admission and declared that Jane did not fabricate any of her testimony at all but merely benefited from "reflection."

174.    In doing so, the JA abdicated its duty to thoroughly weigh Jane's credibility and impartially determine when Jane, a confessed liar, was lying to them.

175.    Instead, to prove its theory that Jane does not lie but merely reflects, the JA refers to REDACTED's eye-witness testimony to Jane's broken toe, though all parties, agree that Jane had a broken toe.

176.    The JA also fails to impartially weigh Jane's motives as being anything more sinister than her fears.

177.   In so doing, the JA overlooked an episode of which it was aware in which Jane boastingly admitted in her own words to a vengeful assault a third party who allegedly insulted her with an ethnic slur in which she vandalized his car in retaliation as follows:

178.   On August 9, 2015 text at 3:39 a.m., Jane sent John the following over a few separate texts:

> "Umm. Walking out of the Jane and a car with a white dude and girl start yelling racist shit at me and my girlfriend . . . and I actual walked up and keyed their car The guy and girl come out of the car and Starts chasing after me and I actually Decked the girl in the face …. And she fell down!!! Heels and shit!!!! Seriously just protecting myself and it Fucking felt good!!!! Anyway guy starts chasing me saying He was going to call the cops and I had to run two blocks before getting into a cab and he was grabbing my wrist but luckily the cab driver drove with door open so I escaped. The end (emoji) fuck."

179.   Four hours later, she texted, "[…] was stupid but I (sic) but I was so mad that I don't really care. No!!!! [not injured] I feel great!!! Just mad that I couldn't key their car harder or do anything to the guy. I just ran from the guy. […] damn he needed a beating"

180.   Also overlooked by the JA's thorough investigation were Jane's feelings about John ending the relationship and returning to a prior girlfriend, and whether jealousy and anger may have been a motive for Jane to express so many inconsistencies and embellishments to her claim.

181.   Jane acknowledged during the investigation that she learned that John had a relationship with another woman, REDACTED, just prior to when her relationship with him began and that John resumed that prior relationship just as he ended his relationship with Jane.

182.   Further, in a lengthy personal statement Jane prepared for the investigation, and again during her testimony on February 4, 2016 before the Review Panel, Jane admits to falling in love and continuing to be in love with John.

26

183.    REDACTED was interviewed during the investigation and alleged that Jane walked into John's dorm room while she was there to instigate a confrontation.

184.    Jane, REDACTED and a witness for Jane, REDACTED, were interviewed in connection with an encounter in which Jane and REDACTED claimed REDACTED approached them.

185.    Jane and REDACTED divulge that they were following REDACTED, but explain that it was in connection with REDACTED's alleged representations of suicidal ideations and their duty to protect her.

186.    REDACTED alleged that Jane and REDACTED approached her and that she has no suicidal ideations, John had not abused her, and she would not disclose any of that to Jane regardless.

187.    The JA makes no finding about the Jane/ REDACTED/REDACTED encounter, or whether REDACTED was abused by John or if Jane was stalking REDACTED or violated a no-contact order by talking with REDACTED.

188.    Jane also sought another WCMC student who was one of John's former girlfriends, REDACTED, under the false premise of buying a vacuum cleaner from her, who allegedly disclosed incidences of alleged discontent with John during the relationship.

189.    Jane's reports of John's relationship with REDACTED and REDACTED are at best unsworn allegations and are not prior findings of domestic violence.  Even REDACTED's own representations about John's behavior with regard to him, for example, banging on the wall between their apartments, on the face of it disqualifies her testimony as relevant to prior domestic violence, and in any event the JA doesn't make a finding regarding the incident.

190.     As such, the JA's use of these statements with respect to prior girlfriends and related interviews in the Investigative Report is in violation of NY CLS Educ Law, Title VII, Art. 129-B, § 6444 in that the law only permits past findings of domestic violence in the disciplinary stage that determines sanction.

191.     As such, the former and current girlfriend allegations are irrelevant to the Disciplinary Action and are not permitted even in the sanctions portion of the investigation.

192.     The JA wrongly incorporated into the Investigative Report the allegations in connection with John's former and current girlfriends to besmirch John's reputation.

**The JA's Investigation of John Doe**

193.     In its investigation of John's role in Jane's complained of events, the JA identified a number of events that overall harmed John's credibility.  However, none of these events were material or relevant to Jane's complained-of events.

194.     In the first instance, the JA attributes to John a calm and affable demeanor, which compared to the JA's description of Jane as being agitated and flat, betrayed the JA's bias that John is stereotypically unfeeling and unmoved by Jane's claims.

195.     John was actually under great duress and highly agitated by the Disciplinary Action.

196.      The JA also attributed to John a motive to lie, "as would any accused person, because he is accused and facing punishment as well as criminal charges."

197.     In so doing, the JA does not consider that John may be motivated to tell the whole truth and nothing but the truth in an effort to exonerate himself.

198.     As such, the JA does not attribute the presumption of innocence to John as it is required to do and instead presumes an aforesaid motive to lie.

199.   To fortify the JA's accusation that John lied during the investigation, the JA points out that it appears he lied to his current girlfriend, REDACTED, about the duration of his relationship with Jane and the volume of sexual activity they had.

200.   The JA's reliance on John's immaterial intra-relationship diplomacy and suppression of sharing intimate information among his lovers, violates defendants' policies as well as state regulation prohibiting consideration of any relationship other than the one between the parties during the investigation.  It is also a petty and irrelevant observation the JA incorporated into the Investigative Report merely to besmirch his reputation.

201.   The JA attributes another immaterial inconsistency to John in that he misstated the start date of his relationship with REDACTED as being one "week after ending his relationship with [Jane]" and not several months before he even met Jane as REDACTED represented during her interview.  John and REDACTED resumed their relationship soon after John ended his relationship with Jane. This is also a petty and irrelevant observation the JA incorporated into the Investigative Report merely to besmirch John's reputation.

202.   In comparison to Jane, the JA judged John's credibility and motives negatively for inconsistencies without considering excuses and justifications that mitigate damage to his credibility as the JA did for Jane.

203.   The JA, in judging John's credibility and motives negatively for these irrelevant and immaterial inconsistencies did not, as it did for Jane when she expressed material inconsistencies relevant to the complained of events, consider John's possible confusion or other failures with word choice, or that with time for "reflection," he may uncover a different "truth," as the JA attributed to Jane.

204.    The JA, in judging John's credibility and motives negatively for these irrelevant and immaterial inconsistencies did not, as it did for Jane when she expressed material inconsistencies relevant to the complained of events, consider John's distress as a result of being accused of sexual misconduct, among other charges, as was manifested in extreme weight loss—ultimately 80 pounds—and other indicia of anxiety.

205.    The JA, in judging John's credibility and motives negatively for these irrelevant and immaterial inconsistencies did not, as it did for Jane when she expressed material inconsistencies relevant to the complained of events, offer counseling to John in violation of state laws.

206.    The JA judged John's credibility and motives negatively for such inconsistencies even though the JA found that his statements may not be material to the allegations in the Disciplinary Action.

207.    Nevertheless, the JA in judging John's credibility and motives negatively for such non-material inconsistencies, found that such inconsistencies "significantly call [John's] credibility into doubt."

208.    All of Jane's inconsistencies were material to the events central to her claims of, among other things, sexual misconduct; however, the JA did not judge such inconsistencies in any way negatively and the JA never called Jane's credibility into doubt.

209.    The JA also accused John of attempting to "deceive" the JA in that he did not include in his evidence disclosures a single screen shot of texts messages between Jane and John in which Jane did not seem interested in sex.  This exclusion, the JA determined, was meant to suppress information harmful to John.

210.    However, the JA found that "both" Jane and John "selected certain text messages to submit to the investigation."

211.    On information and belief, therefore, Jane also did not produce a complete set of all electronic discovery, yet the JA only discredited John's credibility.

212.    The JA also judged John negatively with regard to a video of Jane he presented as evidence.

213.    The video showed Jane trying to seduce John by trying to undo his pants.

214.    John is heard in the video protesting against Jane's actions. John continued to protest Jane's sexual advances after filming ended.

215.    The JA claims that John represented to the JA that the video was made in August 2015.

216.    Jane admitted that she was the woman in the video.

217.    However, Jane claimed that the video was taken in June 2015.

218.    The version of the video John produced was allegedly a copy of the video that did not include meta data of when it was originally taken.

219.    The video is evidence of Jane forcing herself sexually on John while he is verbally resisting.

220.    The video was permissible evidence in that it accounted for sexual interactions between Jane and John, the parties to the Disciplinary Action, and not any other sexual partner.

221.    However, the JA did not charge Jane or make a finding of sexual assault and/or other sexual misconduct in violation of Policy 6.4 that she was exhibiting in the video.

222.    Instead, the JA determined that the video was "irrelevant" to Jane's claims and John's use of the video was to wrongfully "besmirch [Jane's] reputation," and "inappropriate."

223.    At the same time, however, the JA considered Jane's complaint regarding the May Event relevant and her representations with respect to the allegations in connection with former and current girlfriends not as a besmirchment of John's reputation or in any way wrongfully used to strengthen her claims.

224.    The JA denounced John's credibility by referencing another issue irrelevant to Jane's claims regarding whether John violated any rules or orders in connection with his access to Lasdon Hall.

225.    The JA acknowledges that WCMC had not yet made a ruling about a "possible" violation.

226.    Nevertheless, the JA reached its own ruling and found that John's "failure to respect the term of the WCMC directive harms his overall credibility."

227.    In reaching this ruling, the WCMC again failed to afford John a presumption of innocence.

228.    On information and belief, the WCMC ultimately determined that John did not violate a directive with regard to his access to Lasdon Hall.

229.    The JA also failed to be thorough and impartial by not making any finding with regard to material and relevant events that may have been supportive of John's allegations and contrary to Jane's allegations in that the JA did not determine whether John was wearing his sneakers during the incident as he alleged.

230.    John alleged that he was wearing his sneakers when he stepped on Jane's toe.

231.    REDACTED deduced John was wearing his sneakers when she arrived in Jane's room within moments of Jane's second scream in response to her injured toe and reported that she saw John leave Jane's apartment without stopping to put shoes on.

232.    The question of whether John was wearing sneakers or not goes to whether or not he laid down in Jane's bed to take a nap, which is part of Jane's allegations in most of her versions of the incident.

233.    John consistently denied laying down in her bed to take a nap.

234.    The JA also did not make findings of material fact supportive of John's allegations and contrary to Jane's allegations with regard to who got Jane ice after her toe was injured.

235.    John reported that he went to the refrigerator to get Jane ice.

236.    REDACTED also reported that John got her ice.

237.    Jane reported that REDACTED got her ice.

238.    The JA also did not make a finding of fact supportive of John's allegations and contrary to Jane's allegations that Jane and he engaged in conversation between the time John allegedly propositioned Jane for sex and the injurious events.

239.    In some of Jane's versions of events, Jane reported that after John allegedly asked her for sex, she instigated a conversation about school and professional opportunities.

240.    In another of Jane's versions of events, Jane reported that after he asked her for sex, John instigated a similar conversation.

241.    John reported that he never took a nap or propositioned Jane, but conversed with her and asked her if he could use her phone charger prior to hugging her.

242.    Whether or not Jane and John conversed is relevant to whether the subsequent hug between them was in the direct aftermath of a sexual proposition John made that Jane

declined, or whether amicable conversation and/or an interchange about the phone charger ensued, before the hug occurred.

243.   The JA also did not make a finding of fact with what may have been supportive of John's allegations and contrary to Jane's allegations with regard to facts material to the events complained of in that the JA did not determine whether or not the phone charger Jane provided to John was plugged in over the bed or across the room near the sofa.

244.   John alleges he stayed on the sofa at all times except when he rose to meet her for a hug.

245.   Jane, in some of her versions, stated that she crossed the room to plug in the charger near the sofa so as to avoid John in her bed.

246.   In another of her versions, Jane stated that she plugged the charger in over her bed.

247.   The JA instead found that the hug just followed John's sexual proposition.

248.   John's proposition, as Jane alleges, was in accordance with New York's affirmative consent laws in that he asked Jane for sex before acting.

249.   However, John's compliance with law is used against him in that his request for sex became the basis for characterizing the hug and toe breaking as *sexual* battery.

250.   If, as Jane herself alleged, they conversed about unrelated subjects after the proposition but prior to the hug, then the proposition did not just occur, but was mitigated by an intervening, neutral conversation, the hug would be a hug and the toe injury an accident, just as Jane initially alleged.

251.   Instead, the JA wrongly imposed its pattern of sexist stereotypes, and, in this case, racist stereotypes, in that John, an aggressive male and "Neanderthal," who in the May event, flipped Jane over his shoulder cave-man style, and whose pursuit of sex cannot be

abated by the female's declination of sex, intervening conversation, or the mundane task of charging a phone.

**The Sanctions**

252.   The JA found John responsible for sexual battery and misconduct in connection with the touching that resulted in Jane's broken toe, "[b]ecause this happened while the parties, prior intimate partners, were alone in her bedroom where he had just propositioned [Jane] for sex . . ."

253.   Among other sanctions, the JA recommended that John be suspended (deferred until the send of the semester) for one academic year.

254.   The Review Panel did not impose the JA's recommendation to suspend John and characterized the recommended suspension as "unduly punitive."

255.   The Review Panel also found that since it found John "in violation of Policy 6.4, that this will be noted in, and be a part of, his permanent record, and on his official transcript as required by law."

256.   No law requires that such violation of Policy 6.4 be noted in on John's official transcript and be made a part of his permanent record.

257.   WCMC had never, prior to the Disciplinary Action herein, previously investigated a similar disciplinary infraction.

258.   WCMC has never previously placed an annotation on a student's transcript.

259.   Cornell maintains a practice of not annotating student transcripts unless a disciplinary proceeding results in a suspension, expulsion or withdrawal.

260.   Jane appealed the Review Panel's sanctions.  The Appeal Panel imposed the one-year suspension.

## FIRST CAUSE OF ACTION
### 20 U.S.C. § 1681 *et seq.*
### TITLE IX OF THE EDUCATION AMENDMENTS OF 1972
### (Erroneous Outcome)

261.    The Plaintiff repeats, reiterates, and realleges each and every allegation set forth above as

if fully set forth herein.

262.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

>    No person in the United States shall, on the basis of sex, be excluded from
>    participation in, be denied the benefits of, or be subjected to discrimination under
>    any education program or activity receiving Federal financial assistance.

263.    Upon information and belief, defendants receive federal financial assistance for research

and development.

264.    Plaintiff's gender is protected by Title IX.

265.    Defendants' initiated a prosecution pursuant to Policy 6.4 against John based on the

accusation that John accidently broke Jane's toe during a hug in which she participated albeit

allegedly reluctantly, which does not on its face rise to a violation of Policy 6.4.

266.    As a result of defendants' prosecution, Plaintiff was suspended, a penalty so severe under

the circumstances, defendant WCMC initially considered it to be "unduly punitive."

267.    An intentional and motivating factor for WCMC's imposition of this extreme and

outrageous penalty was Plaintiff's gender.

268.    Based upon the forgoing, as a direct and proximate result of the Defendants' conduct as

alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have

been severely harmed and he has suffered loss of educational and professional opportunities, loss

of future career prospects, and other direct and consequential damages and has suffered damages

including pain, suffering, mental anguish, psychological trauma, emotional distress, loss of

capacity for the enjoyment of life.

269.    By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies

available including an award of liquidated and punitive damages, prejudgment interest,

attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this

action.

## SECOND CAUSE OF ACTION
### 20 U.S.C. § 1681 *et seq.*
### TITLE IX OF THE EDUCATION AMENDMENTS OF 1972
### (Selective Enforcement)

270.    The Plaintiff repeats, reiterates, and realleges each and every allegation set forth above as

if fully set forth herein.

271.    Defendants exhibited patterns of decision-making that tend to show the influence of

discrimination against the male Plaintiff that affected the Disciplinary Action.

272.    Defendants exhibited anti-male bias during the disciplinary action by the differential

treatment he and Jane received in that, among other things, Jane's inconsistent testimony

material to the claims relevant to the Disciplinary Action were either downplayed, justified

and/or otherwise excused by defendants whereas John's credibility was challenged and deemed

suspect in connection to representations that were non-material.

273.    Defendants exhibited anti-male bias during the disciplinary action by the differential

treatment he and Jane received in that, among other things, Jane's mental state characterized in a

single, brief doctor's note as "symptoms" of PTSD was a mitigating factor in weighing Jane's

inconsistent testimony as well as her credibility, motives and evidence and granted conclusive

status and meaningful influence in the Disciplinary Action even though she was never diagnosed with PTSD and there is no evidence that PTSD can cause inconsistent testimony.

274.    Defendants exhibited anti-male bias during the disciplinary action by the differential treatment he and Jane received in that, among other things, John's mental state during the Disciplinary Action in which he lost 80 pounds and suffered extreme sense of hopelessness, as if his life had no meaning and was over after being suspended was not addressed as a mitigating factor by defendants in weighing John's credibility, motives and evidence.

275.    Defendants exhibited anti-male bias during the disciplinary action by the differential treatment he and Jane received in that, among other things, defendants could not attribute a single negative motive to Jane even though Plaintiff, his attorney, and Det. Vasquez expressed that Jane had an agenda for monetary gain.

276.    Defendants exhibited anti-male bias during the disciplinary action by the differential treatment he and Jane received in that, among other things, defendants could not attribute a single negative motive to Jane even though Jane herself exhibited vengeful actions and motivations in connection to a racial slur.

277.    Defendants exhibited anti-male bias during the disciplinary action by the differential treatment he and Jane received in that, among other things, defendants could not attribute vengeance to Jane's openly expressed motive for her appeal requesting suspension was so that Plaintiff's residency program would learn of his offenses.

278.    Defendants exhibited anti-male bias during the disciplinary action by the differential treatment he and Jane received in that, among other things, defendants allowed Jane to introduce claims and evidence based on prior events in their relationship such as the May 16, 2015 events,

but John was not permitted to introduce evidence of the video that exhibits Jane attempting to seduce John over his protestations on the basis that the video was damaging to Jane's reputation.

279.    Defendants exhibited anti-male bias during the disciplinary action by the differential treatment he and Jane received in that, among other things, defendants allowed Jane to introduce impermissible testimony in connection with former and current girlfriends damaging to John's reputation.

280.    Defendants further exhibited anti-male bias during the disciplinary action by the additional differential treatment he and Jane received as set forth herein.

281.    Based upon the forgoing, as a direct and proximate result of the Defendants' conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including pain, suffering, mental anguish, psychological trauma, emotional distress, loss of capacity for the enjoyment of life.

282.    By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of liquidated and punitive damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

### THIRD CAUSE OF ACTION
### 42 U.S.C. § 2000d *et seq.*
### TITLE VI OF THE CIVIL RIGHTS ACT OF 1964

283.    The Plaintiff repeats, reiterates, and realleges each and every allegation set forth above as if fully set forth herein.

284.    Plaintiff is a Nigerian-born, African American and is a member of a protected class.

285.    Plaintiff had an excellent academic record at WCMC and qualified for a match in an elite neuro-surgery residency program.

286.    Plaintiff suffered an adverse action in pursuit of his education by defendant WCMC, which was deliberately indifferent to a claim of racial/ethnic/national origin harassment in which Plaintiff was described, among other things, as a Neanderthal, in an email that was sent to at least one other co-worker.

287.    Plaintiff suffered an adverse action in pursuit of his education by defendants in that Defendants' initiated a prosecution pursuant to Policy 6.4 against John based on the accusation that John accidently broke Jane's toe during a hug in which she participated albeit reluctantly, which does not on its face rise to a violation of Policy 6.4.

288.    An intentional and motivating factor for Defendants' decision to prosecute the proceeding was affected by Plaintiff's race and/or ethnicity.

289.    As a result of defendants' prosecution, Plaintiff was suspended, a penalty so severe under the circumstances, defendant WCMC initially considered it to be "unduly punitive."

290.    An intentional and motivating factor for WCMC's imposition of this severe penalty was affected by Plaintiff's race, ethnicity, and/or national origin.

291.    Defendants exhibited patterns of decision-making that tend to show the influence of racial and/or ethnic discrimination against the Plaintiff that affected the Disciplinary Action.

292.    Defendants exhibited such race, ethnicity, and/or national origin bias during the disciplinary action by the differential treatment he and Jane received in that, among other things, Jane's inconsistent testimony material to the claims relevant to the Disciplinary Action were either downplayed, justified and otherwise excused by defendants whereas John's credibility was challenged and deemed suspect in connection to representations that were non-material.

293.     Defendants exhibited such race, ethnicity, and/or national origin during the disciplinary action by the differential treatment he and Jane received in that, among other things, Jane's mental state characterized in a single, brief doctor's note as "symptoms" of PTSD was a mitigating factor in weighing Jane's inconsistent testimony as well as her credibility, motives and evidence and granted conclusive status and meaningful influence in the Disciplinary Action even though she was never diagnosed with PTSD and there is no evidence that PTSD can cause inconsistent testimony.

294.     Defendants exhibited race, ethnicity, and/or national origin bias during the disciplinary action by the differential treatment he and Jane received in that, among other things, John's mental state during the Disciplinary Action in which he lost 80 pounds and suffered extreme sense of hopelessness, as if his life had no meaning after being suspended was not addressed as a mitigating factor by defendants in weighing John's credibility, motives and evidence.

295.     Defendants exhibited such race, ethnicity, and/or national origin bias during the disciplinary action by the differential treatment he and Jane received in that, among other things, defendants could not attribute a single negative motive to Jane even though Plaintiff, his attorney, and Det. Vasquez expressed that Jane had an agenda for monetary gain.

296.     Defendants exhibited such racial and/or ethnic bias during the disciplinary action by the differential treatment he and Jane received in that, among other things, defendants could not attribute a single negative motive to Jane even though Jane herself exhibited vengeful actions and motivations in connection to a racial slur.

297.     Defendants exhibited such race, ethnicity, and/or national origin bias during the disciplinary action by the differential treatment he and Jane received in that, among other things,

defendants could not attribute vengeance to Jane's openly expressed motive for her appeal requesting suspension was so that Plaintiff's residency program would learn of his offenses.

298.   Defendants further exhibited race, ethnicity, and/or national origin bias during the disciplinary action by the additional differential treatment he and Jane received as set forth herein.

299.   Based upon the forgoing, as a direct and proximate result of the Defendants' conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including pain, suffering, mental anguish, psychological trauma, emotional distress, loss of capacity for the enjoyment of life.

300.   By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of liquidated and punitive damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

## FOURTH CAUSE OF ACTION
## BREACH OF CONTRACT

301.   The Plaintiff repeats, reiterates, and realleges each and every allegation set forth above as if fully set forth herein.

302.   At all times relevant hereto, a contractual relationship existed between defendants and John pursuant to Policy 6.4 and WCMC's procedures.

303.   Defendants are required to act in accordance with these Policies in adjudicating reports of alleged violations of student conduct standards.

304.    For all the reasons set forth above, defendants materially breached its contracts with John by failing to comply with its obligations, standards, policies, and procedures set forth in the Policies in the course of the Disciplinary Action against John, and by subjecting him to a blatantly arbitrary and capricious disciplinary proceeding.

305.    Based upon the forgoing, as a direct and proximate result of the Defendants' conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including pain, suffering, mental anguish, psychological trauma, emotional distress, loss of capacity for the enjoyment of life.

306.    By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of liquidated and punitive damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

### FIFTH CAUSE OF ACTION
### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

307.    The Plaintiff repeats, reiterates, and realleges each and every allegation set forth above as if fully set forth herein.

308.    Based on the foregoing facts, Defendants violated the covenant of good faith and fair dealing implied in its contracts with John by subjecting him to an unfair, arbitrary and capricious Disciplinary Action, and denying him the fruits of his contracts with Defendants.

309.    Based upon the forgoing, as a direct and proximate result of the Defendants' conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have

been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including pain, suffering, mental anguish, psychological trauma, emotional distress, loss of capacity for the enjoyment of life.

310.    By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of liquidated and punitive damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

**SIXTH CAUSE OF ACTION**
**ESTOPPEL AND RELIANCE**

311.    The Plaintiff repeats, reiterates, and realleges each and every allegation set forth above as if fully set forth herein.

312.    Defendants' various standards, policies and procedures constitute representations and promises that Defendants expected or should have reasonably expected would induce action or forbearance by John.

313.    Defendants expected or should have expected John to accept WCMC's offer of admission, incur tuition and fee expenses, and choose not to attend other colleges based on its express and implied promises, including that WCMC would provide John with a fair, impartial and thorough process in the event he was accused of a sexual misconduct violation.

314.    John relied to his detriment on defendants' express and implied promises and representations.

315.    Based upon the forgoing, as a direct and proximate result of the Defendants' conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have

been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including pain, suffering, mental anguish, psychological trauma, emotional distress, loss of capacity for the enjoyment of life.

316.     By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of liquidated and punitive damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

**SEVENTH CAUSE OF ACTION**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

317.     The Plaintiff repeats, reiterates, and realleges each and every allegation set forth above as if fully set forth herein.

318.     The actions of WCMC were willful and intentional.

319.     WCMC knew or should have known that its actions in reversing its sanction on appeal and imposing the one-year suspension it previously determined to be "unduly punitive" would cause John severe emotional distress and hopelessness.

320.     WCMC's conduct was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.

321.     WCMC's conduct was the direct and proximate cause of John's severe emotional distress in which he has had extreme sense of hopelessness, as if his life had no meaning.

322.     Based upon the forgoing, as a direct and proximate result of the Defendants' conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss

of future career prospects, and other direct and consequential damages and has suffered damages including pain, suffering, mental anguish, psychological trauma, emotional distress, loss of capacity for the enjoyment of life.

323.     By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of liquidated and punitive damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

## EIGHTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

324.     The Plaintiff repeats, reiterates, and realleges each and every allegation set forth above as if fully set forth herein.

325.     When Defendants undertake to investigate allegations of sexual and other misconduct against one of its students, it owes that student a duty to protect him from foreseeable harm.

326.     By participating in the Disciplinary Action, John reasonably relied upon defendants' duty to protect him from harm.

327.     For all the reasons above, Defendants breached their duties of reasonable care.

328.     As a result, John has suffered physical harm, including severe emotional distress.  He is deeply depressed and anxious; he has lost weight; and he has had extreme sense of hopelessness, as if his life had no meaning.

329.     A reasonable person would have suffered severe emotional distress under the same or similar circumstances.

330.     As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## NINTH CAUSE OF ACTION
## NEW YORK CITY ADMINISTRATIVE CODE, § 8-101, *et seq.*,
## THE NEW YORK CITY HUMAN RIGHTS LAW
### Race/Ethnicity/National Origin Discrimination

331.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above as if fully set forth herein.

332.    As set forth in detail above, Plaintiff was discriminated against by Defendants based on his race, ethnicity and/or national origin.

333.    Based upon the forgoing, as a direct and proximate result of the Defendants' conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including pain, suffering, mental anguish, psychological trauma, emotional distress, loss of capacity for the enjoyment of life.

334.    By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of liquidated and punitive damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

## TENTH CAUSE OF ACTION
## NEW YORK CITY ADMINISTRATIVE CODE, § 8-101, *et seq.*,
## THE NEW YORK CITY HUMAN RIGHTS LAW
### Gender Discrimination

335.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above as if fully set forth herein.

336.    As set forth in detail above, Plaintiff was discriminated against by Defendants based on his gender.

47

337.    Based upon the forgoing, as a direct and proximate result of the Defendants' conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including pain, suffering, mental anguish, psychological trauma, emotional distress, loss of capacity for the enjoyment of life.

338.    By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of liquidated and punitive damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

**ELEVENTH CAUSE OF ACTION**
**NEGLIGENT SUPERVISION**

339.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above as if fully set forth herein.

340.    The JA's investigation and all related conduct occurred under Defendants' authority and with Defendants' specific knowledge.  The Review Panel's decision and all related conduct also occurred under Defendants' authority and with Defendants' specific knowledge.  The Appeal Panel's decision and all related conduct also occurred under Defendants' authority and with Defendants' specific knowledge.

341.    Defendants failed to adequately supervise the JA, the Review Panel and the Appeal Panel sufficiently to provide Plaintiff with a fair and impartial adjudication in accord with Defendants' policies and with applicable law.

342.     Defendants failed to adequately supervise the JA, the Review Panel and the Appeal Panel sufficiently to provide Plaintiff with a non-discriminatory adjudication in accord with Defendants' policies and with applicable law.

343.     Based upon the forgoing, as a direct and proximate result of the Defendants' conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including pain, suffering, mental anguish, psychological trauma, emotional distress, loss of capacity for the enjoyment of life.

344.     By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of liquidated and punitive damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

## TWELFTH CAUSE OF ACTION
## PERMANENT INJUNCTIVE RELIEF

345.     The Plaintiff repeats, reiterates, and realleges each and every allegation set forth above as if fully set forth herein.

346.     Defendants have violated its contractual obligations and state law.

347.     John's educational and career opportunities have been severely damaged. Without appropriate redress, Defendants will continue to label John as a sexual offender, greatly jeopardizing his prospects government and public sector employment, as well as private employment, with no end in sight.

348.     John is entitled to redress that will make him whole and requests that this Court issue a permanent injunction: (a) reversing the findings and sanction against John made by Defendants

pursuant to the Disciplinary Action, the Investigative Report, the Review Panel Decision and the Appeal Panel Decision; (b) ordering WCMC to expunge John's disciplinary record and remove it from his education record; and (c) ordering WCMC to provide John with certification that shall be made available to third parties (such as prospective and current employers) certifying that the findings and sanction have been reversed and expunged from John's education record.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff John Doe, respectfully requests the Court: a. Order defendants to reverse and expunge its findings of responsibility and sanction from John's education record, b. Order defendants to verify this reversal and expungement of John's education record by providing John with certification to third parties that the findings and sanction have been reversed and expunged from John's education record; c. Award John compensatory damages in in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages; d. Award prejudgment interest; e. Award attorneys' fees and costs pursuant to statutory or common law doctrines providing for such award; and f. Grant such other and further relief that the Court deems just and proper.

## PLAINTIFF DEMANDS A TRIAL BY JURY

Dated: June 24, 2016                    THE KAPLAN LAW OFFICE
        New York, New York

                                        _____/s/_____
                                        SUSAN R. KAPLAN (1735)
                                        30 Wall Street, 8th Floor
                                        New York, NY 10005
                                        Tel. 347-683-2505